**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                        :
GOLDMAN, SACHS & CO.,                   :
SCOTT T. SHEFFER,                       :
And ERIC W. GETTLEMAN,                  :
                                        :     Case No. 13-MC-130
          v.                            :
                                        :
ATHENA VENTURE PARTNERS, L.P.           :
_____         :

## <u>ORDER</u>

AND NOW, this ___ day of _____, 2013, upon consideration of the Motion to

Vacate and Remand Arbitration Award made by Athena Venture Partners, L.P., and the

opposition thereto, it is hereby **ORDERED** that the Motion is **DENIED**; and

**IT IS FURTHER ORDERED** that the Application of Goldman, Sachs & Co., Scott T.

Sheffer, and Eric W. Gettleman for an Order Confirming An Arbitration Award Including

Expungement Relief is **GRANTED** and the arbitration award in _Athena Venture Partners, L.P._

_v. Goldman, Sachs & Co., Scott T. Sheffer, and Eric W. Gettleman_, FINRA Dispute Resolution

Arbitration Case No. 09-04771 is **CONFIRMED** in all respects.


                                        _____
                                        The Honorable J. Curtis Joyner
                                        United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---
                 :

GOLDMAN, SACHS & CO.,       :

SCOTT T. SHEFFER,             :

And ERIC W. GETTLEMAN,    :

                 :    Case No. 13-MC-130

        v.             :

                 :

ATHENA VENTURE PARTNERS, L.P.   :

---
                 :

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION
TO VACATE AND REMAND ARBITRATION AWARD**

       Goldman, Sachs & Co. ("Goldman"), Scott T. Sheffer, and Eric W. Gettleman oppose the

Motion to Vacate and Remand Arbitration Award filed by Athena Venture Partners, L.P.

("Athena") and respectfully request that the Court deny that motion and grant their May 9, 2013

Application for Order Confirming An Arbitration Award Including Expungement Relief.

## I.    INTRODUCTION

       On March 13, 2013, a FINRA arbitration panel, sitting in Philadelphia, issued an award

in favor of Goldman, Mr. Sheffer, and Mr. Gettleman in FINRA Case Number 09-04771.  That

award, signed by Kathleen K. Murphy (Chair of the panel) and Edward T. Borer, but not the

third arbitrator, Demetrio S. Timban, is valid and should be confirmed.  None of Athena's

arguments for setting the award aside comes close to satisfying the strict standards for vacatur.

       Athena alleges, for example, that Mr. Timban "defected" or "abandoned" participation in

the arbitration, but there is no factual support for that assertion.  The mere fact that Mr. Timban

did not sign the award does not invalidate the award.  Both the FINRA rules and the parties'

agreement require only that a majority of arbitrators sign an award, which is precisely what

occurred here.  Mr. Timban was present for all hearing sessions, heard all of the testimony and

evidence, and stayed in the room with the other arbitrators after hearing sessions.  FINRA has publicly stated that Mr. Timban participated in the panel's deliberations,[1] and there is no evidence to the contrary.

Alternatively, Athena argues that Mr. Timban should have been removed from the arbitration panel due to his alleged non-disclosure of events that occurred after he was appointed to the panel.  But Athena fails to address the relevant criteria that govern removal of a sitting FINRA arbitrator and vacatur of an arbitration award for an arbitrator's "misbehavior."  A sitting FINRA arbitrator can be removed only when there is reason to believe that he is biased or lacks impartiality.  An award can be vacated for arbitrator misbehavior only when the misconduct actually prejudices a party and denies that party a fundamentally fair hearing.  Here, the fact that Mr. Timban allegedly wrote checks on insufficient funds in a wholly unrelated matter, or was charged with the unauthorized practice of law in New Jersey and later disciplined by the bar authorities in Michigan, does not show that Mr. Timban was biased, partial, or had conflicts of interest affecting Athena in this arbitration, and does not establish the requisite prejudice.

In any event, Athena waived the "unauthorized practice of law" and related "bar discipline" arguments.  In March 2012, many months before the arbitration hearing ended, Mr. Timban disclosed to FINRA, and FINRA then disclosed to the parties, that Mr. Timban had been charged with the unauthorized practice of law in New Jersey.  He further disclosed that the charge was reported to the Michigan bar authorities.  He even provided the case number for the indictment, allowing the parties to investigate the matter further, if they wished.  Athena did not

---

[1] *See* P. Diamond, "FINRA to Conduct Arbitrator Background Checks," 45 Securities Reg. and Law Rep. 1213 (July 1, 2013) ("'We understand that Timban participated in the panel deliberations and agreed with the majority decision,' the [FINRA] spokesperson said."), attached as Exhibit 25 to the Declaration of Kathryn E. Deal ("Deal Decl.") submitted with this opposition brief.

then object to Mr. Timban's continued participation as an arbitrator. Mr. Timban thus remained

on the panel and, in October 2012, sat for six more days of hearings. It was only after Athena

lost the arbitration in March 2013 that Athena first complained about Mr. Timban's activities,

including those that Athena had already known about for more than a year.

Athena's memorandum also misrepresents what happened during the arbitration hearings

in its efforts to get a "do-over." In particular, Athena's claims that the panel "effectively

excluded" or "refused to hear" its purportedly "uncontroverted" evidence are plainly false. All

of the evidence that Athena claims the panel "refused to hear" was actually heard by the panel

and admitted into evidence. None of it was uncontroverted. The panel simply did not find

Athena's evidence convincing or credible in light of the contrary evidence that Goldman, Mr.

Sheffer, and Mr. Gettleman presented. In fact, the overwhelming record evidence – ignored by

Athena in its motion papers – shows that Athena received and relied upon a Private Placement

Memorandum ("PPM") for Goldman Sachs Liquidity Partners 2007, L.P. ("the Fund" or

"Liquidity Partners"), that Goldman, Mr. Sheffer, and Mr. Gettleman made full and accurate

disclosures about the Fund to Athena's principals, and that the Fund was a suitable investment

for Athena.

Finally, the record of the arbitration proceedings belies Athena's claim that the panel

"manifestly disregarded" the law in issuing its award. As an initial matter, "manifest disregard"

is no longer an established ground for vacatur in this jurisdiction. Even if it were, the panel did

not manifestly disregard the law on the enforceability of contractual non-reliance clauses, as

Athena claims. In fact, the panel specifically asked the parties for briefing on the law relating to

disclaimers of reliance on oral statements and both sides presented memoranda on that issue.

The authorities submitted by Goldman, Mr. Sheffer, and Mr. Gettleman established that non-

reliance clauses like the one in Athena's Subscription Agreement for Liquidity Partners are legally valid and enforceable.  Having considered the legal authority presented by both sides, the panel agreed with the authorities cited by Goldman, Mr. Sheffer, and Mr. Gettleman.  The panel's findings on that score had ample legal support.

For all of these reasons, as set forth in more detail below, none of Athena's arguments satisfies the demanding requirements of the Federal Arbitration Act for vacating an arbitration award.  Athena's motion, therefore, should be denied and the pending application for an order confirming the FINRA panel's award should be granted.

## II.   THE UNDERLYING DISPUTE

Athena is a well-funded and highly sophisticated investment partnership run by financial professionals with decades of investment experience.  Tr. at 128-29, 132-33, 460-62[2]; Ex. 13 to Deal Decl., R-117.  Dr. Caruso is an accomplished businessman with forty years of experience.  Tr. at 389-97.  In 1989, Dr. Caruso founded Integra Life Sciences, a very successful publicly held company with more than one billion dollars in assets.  Tr. at 395, 460-61.  Mr. DiLella is the Chief Financial Officer of Provco Group, a limited liability company owned by Dr. Caruso which serves as the general partner of Athena.  Tr. at 115.  Mr. DiLella, who has been Athena's principal contact with Goldman, Tr. at 116, 117, 121-22, has more than thirty years of experience in business and finance.  Ex. 13 to Deal Decl., R-117.

Athena came to Goldman to pursue higher-risk, higher-reward alternative investments.  Tr. at 158-59, 465-66; Ex. 12 to Deal Decl., R-112 at A001463.  Consistent with that strategy, in August 2007, Athena invested in Liquidity Partners, a relatively high-risk and potentially high-reward Goldman fund, formed to take advantage of what were thought to be temporary dislocations in the fixed income markets.  At that time, Mr. Sheffer was the private wealth

---

[2] The transcript pages cited herein are all attached as Exhibit 2 to the Deal Decl.

advisor at Goldman who worked with Athena.  Tr. at 962, 963.  Mr. Gettleman was an Asset

Management Client Portfolio Manager at Goldman.  Tr. at 1319.  He participated in one phone

call with Athena on August 13, 2007 to provide information about the Fund and to answer any

questions.  Tr. at 1485-92.

Before Athena made its investment in Liquidity Partners, Goldman provided to Athena

clear and complete disclosures – in a Private Placement Memorandum ("PPM") and otherwise –

explaining the nature of the Fund, the leverage to be employed by the Fund, and the risks

associated with the Fund, including the risks incident to the use of leverage.  Tr. at 217-22, 225-

28 (DiLella); Tr. at 784, 785, 794, 795, 797-98, 799 (Caruso); Ex. 6 to Deal Decl., R-7 at 6, 81-

82 (PPM disclosures re asset types); *id.* at 7, 71-72 (PPM disclosures re leverage and leverage

risk); *id.* at 22, 67-68 (PPM disclosures re risk).  At the time of its investment, Athena

acknowledged in writing that it had received the PPM.  Ex. 7 to Deal Decl., R-12 at 14, ¶ 5a; Tr.

at 247, 251.  Athena also represented in writing that it had read and understood the disclosures in

the PPM and was relying solely upon them in making its decision to invest.  Ex. 7 to Deal Decl.,

R-12 at 14, ¶ 5a.  On a monthly basis, Goldman kept Athena apprised of the performance of the

Fund, and, in early 2008, Goldman and the Fund again made extensive disclosures to Athena

about the Fund's use of leverage and the associated risks.  Tr. at 253-66; Ex. 8 to Deal Decl., R-

15 at 3, 21-22.  Athena seemed content and made no complaint.

It was not until the collapse of the financial markets in the Fall of 2008, when the Fund

was deleveraged to control further losses, that Athena first complained about the adequacy of the

pre-investment disclosures, the use of leverage, or the performance of the Fund.  In an attempt to

shift blame for financial losses that were endemic to these kinds of alternative investments in

2008, Athena then claimed that Goldman, Mr. Sheffer, and Mr. Gettleman had told Athena – and

Athena had believed – that the opportunistic alternative investment in Liquidity Partners would be virtually "risk-free."  In particular, Athena claimed for the first time that Goldman, Mr. Sheffer, and Mr. Gettleman did not tell Athena that the Fund would be leveraged, even though (i) Athena expected to receive a 15-20% annualized net return, Tr. at 204, and (ii) both Dr. Caruso and Mr. DiLella admitted at the hearing that they received pre-investment documentation (i.e., a "Bluebook") stating that the Fund "engages in leverage" and involves a risk of "loss of the entire amount that is invested,"  Ex. 5 to Deal Decl., R-5 at 17, 18; Tr. at 194-96, 634-35.  Athena also claimed for the first time that it never received the PPM for the Fund, even though Athena had previously acknowledged, in writing, that it did receive it.  Ex. 7 to Deal Decl., R-12 at 14, ¶ 5a; Tr. at 247, 251.  As a matter of credibility, as a matter of fact, and as a matter of law, Athena's claims failed.

On March 13, 2013, following an extended arbitration, the panel issued its award, denying Athena's claims in their entirety.  *See* Ex. 1 to Deal Decl., Award ¶ 1.  The panel was not required to, and did not, set forth all the reasons for its award; Athena had refused to join Goldman, Mr. Sheffer, and Mr. Gettleman in a pre-hearing request for an "explained decision." *See* Ex. 19 to Deal Decl., FINRA Code Rule 12904.  The panel was nonetheless required to provide a "brief written explanation" of the reasons for its expungement-related finding that Athena's claims and allegations against Mr. Sheffer and Mr. Gettleman were "clearly erroneous" and "false."  Ex. 1 to Deal Decl., Award ¶¶ 2, 3.  It therefore explained why it found that "the Fund was a suitable investment" for Athena, relying in part on the testimony of the expert witness on suitability called by Goldman, Mr. Sheffer, and Mr. Gettleman and on the testimony of Mr. Sheffer and Mr. Gettleman, all of which the panel found to be credible.  *Id.* ¶ 4.  The panel also explained why it had concluded that Athena's misrepresentation claims were "not

6

supported by the evidence," discussing, among other things, an August 6, 2007 email from Mr. Sheffer to Athena enclosing the Bluebook.  *Id.*  The panel concluded that Athena's allegations of oral misrepresentations "were not proven" and that the testimony of Dr. Caruso and Mr. DiLella, Athena's principals, about the supposed failure to supply a PPM "was not convincing."  *Id.*  The panel observed that the PPM "includes approximately forty pages of disclosure regarding various risks associated with investment in the Fund, including those that Claimant alleges were not disclosed to it . . . ."  *Id.*

The panel issued its decision after hearing nine days of testimony from ten witnesses and considering dozens of exhibits and extensive briefing from both sides.  Although it would not be appropriate to revisit all of the evidence presented at the arbitration hearing, Goldman, Mr. Sheffer, and Mr. Gettleman take this opportunity to correct some of Athena's inaccurate statements to the Court about the record developed at the hearing.

*First*, although it was Athena's position that Mr. DiLella and Dr. Caruso told Goldman that they did not want to take a significant risk to principal when they invested in Liquidity Partners, both Mr. Sheffer and Mr. Gettleman testified that neither Mr. DiLella nor Dr. Caruso said any such thing.  Tr. at 1018 (Sheffer), 1497-98 (Gettleman).  Further, the Bluebook for Liquidity Partners, which both Mr. DiLella and Dr. Caruso indisputably received and read before Athena invested, specifically and repeatedly said that any investment in the Fund would "involve a high degree of risk" and would pose a "risk of investment loss," including "loss of the entire amount that is invested."  Ex. 5 to Deal Decl., R-5 at 17, 18; Ex. 9 to Deal Decl., R-58B, attachment, at 17, 18.

*Second*, the evidence was not "undisputed," Athena's Mem. at 7, that an investment in Liquidity Partners was inconsistent with Athena's stated "Capital Appreciation" investment

objective.  By selecting Capital Appreciation as its account objective, Athena expressly

consented to the use of "leverage" and indicated that it was willing to "assume a higher risk

commensurate with investor's expected returns."  Tr. at 159-62; Ex. 12 to Deal Decl., R-112 at

A001463.  The expert witness for Goldman, Mr. Sheffer, and Mr. Gettleman testified that

Liquidity Partners fit the "Capital Appreciation" objective better than a "Speculative

Investments" objective.  Tr. at 2069.  Moreover, the investment in the Fund was consistent with

Athena's prior investments with Goldman, all of which used leverage and involved a significant

degree of risk.  Tr. at 147, 149-55, 592-97.

*Third*, Athena mischaracterizes statements in the August 6, 2007 e-mail from Mr. Sheffer

to Mr. DiLella.  Athena's Mem. at 7-10.  The Bluebook was attached to that transmittal e-mail,

and, as discussed below, the e-mail and Bluebook accurately disclosed the types of investments

the Fund would make, the Fund's use of leverage, and the risks of loss associated with an

investment in the Fund.  Ex. 5 to Deal Decl., R-5 at 6, 10, 17-18.  There were many days of

testimony about the e-mail, the Bluebook, and the Fund's strategy.  In its memorandum, Athena

discusses only the testimony that it believes is helpful; it does not so much as acknowledge the

testimony and documentary evidence that undercut its arguments – evidence that the panel found

persuasive.

*Fourth*, the evidence did not support Athena's claim that Liquidity Partners was operated

in a way that was inconsistent with the strategy outlined in the Bluebook and the PPM.  Athena's

Mem. at 10-13.  Athena's memorandum places great emphasis on investments in the ABX index,

which relates to prices in the mortgage markets.  The Bluebook, however, disclosed to Athena

that the Fund would be looking at opportunities in commercial and residential mortgage markets.

Ex. 5 to Deal Decl., R-5 at 6, 9, 10.  It even presented a chart of price dislocations for the ABX

index to show why it might be an attractive investment opportunity for the Fund. *Id.* at 10. That same disclosure, along with additional explanation of the ABX and its risks, was provided by Mr. Gettleman during an August 13, 2007 call with Mr. DiLella and Dr. Caruso. *E.g.*, Tr. at 1402. The Fund's ABX concentrations in early to mid-2008, moreover, were consistent with the investment strategy of the Fund: the Fund's strategy was to buy assets at depressed prices due to forced selling, and the Fund's managers thought the ABX presented such an opportunity in early to mid-2008. Tr. at 1755, 1785, 1787.

**Finally**, Athena completely ignores the context within which the Fund was deleveraged and Athena lost money, thereby presenting a misleading version of "the facts." The deleveraging took place in September-October-November 2008, not "June 2008," as Athena suggests in its memorandum. Tr. at 1766. The decision to deleverage the Fund was made in the context of the October 2008 financial crisis, a global market collapse of almost unprecedented proportions. "[T]he market seized up" and prices plummeted. Tr. at 1762. The Fund managers deleveraged Liquidity Partners to prevent the Fund from becoming insolvent in that market crisis, and to prevent investors from losing their entire investment. Tr. at 1761-68. As a result of the market collapse and the deleveraging, losses were realized. But many investors – not only investors in Liquidity Partners[3] – lost money in October 2008. And both of Athena's own experts agreed that the decision to deleverage the Fund in the Fall of 2008 was prudent. Tr. at 370, 1934-35 ("I would say it was very prudent to deleverage. That was a smart move, I think.").

## III.   LEGAL STANDARD

"There is a strong presumption under the Federal Arbitration Act, 9 U.S.C. § 1 et seq., in favor of enforcing arbitration awards." *Brentwood Med. Assocs. v. United Mine Workers of Am.*,

---

[3] Goldman had invested $100 million of its own money in Liquidity Partners, and suffered losses comparable to those of other investors in the Fund. Tr. at 1820-21.

396 F.3d 237, 241 (3d Cir. 2005).  A district court may vacate an arbitration award only "under exceedingly narrow circumstances." *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003); *see also United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 379 (3d Cir. 1995) ("District courts have very little authority to upset arbitrators' awards.").

Section 10(a) of the Federal Arbitration Act (FAA) provides the exclusive grounds for vacating an arbitration award.  *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008). Under § 10(a), a district court may vacate an arbitration award only in the following circumstances:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10.

"The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987); *see also Tanoma Mining Co. v. Local Union No. 1269, United Mine Workers of Am.*, 896 F.2d 745, 747 (3d Cir. 1990) ("A district court is not free to vacate an award merely because it views the merits differently.").  "[T]he Court's role in reviewing the outcome of arbitration proceedings is not to correct factual or legal errors made by an arbitrator and courts should not re-weigh the evidence

to decide whether to vacate the award." *Southco, Inc. v. Reell Precision Mfg. Corp.*, 556 F. Supp. 2d 505, 510 (E.D. Pa. 2008), *aff'd*, 331 F. App'x 925 (3d Cir. 2009).

"The net result of a court's application of this standard is generally to affirm easily the arbitration award under this extremely deferential standard – a result that is squarely in line with the purpose behind the FAA where courts are tasked with reviewing an arbitration decision." *Dluhos*, 321 F.3d at 370; *see also Newark Morning Ledger Co. v. Newark Typographical Union Local 103*, 797 F.2d 162, 165 (3d Cir. 1986) ("This strict standard means that a reviewing court will decline to sustain an award 'only in the rarest case.'" (quoting R. Gorman, Labor Law 586 (1976)).

## IV.    ARGUMENT

### A.    The Award Is Valid Because It Was Signed by a Majority of the Arbitrators and There Is No Support for the Assertion that Mr. Timban Did Not Participate in the Arbitration.

The award in this case complied with the parties' agreement and the FINRA Code of Arbitration Procedure for Customer Disputes ("FINRA Code"). The FINRA Code states that an award shall be signed by a majority of arbitrators. *See* Ex. 19 to Deal Decl., FINRA Code Rule 12904(a) ("All awards shall be in writing and signed by a majority of the arbitrators or as required by applicable law."). Likewise, Athena expressly agreed that a decision by a majority of the panel would be binding. *See* Ex. 7 to Deal Decl., R-12 at 23, ¶ 19(c) ("The award of the arbitrator or a majority of the arbitrators, as the case may be, will be final, and judgment upon the award rendered may be entered in any court having jurisdiction."). Because two of the three arbitrators signed the award, in compliance with the rules and the parties' agreement, the award is valid and enforceable; that Mr. Timban did not sign the award is not grounds for vacatur.

From the earliest days of non-judicial dispute resolution, courts have confirmed the validity of awards in similar circumstances. Specifically, where the parties' contract provides

that an award by the majority of the arbitrators will be binding, an award will not be vacated

merely because one member of the panel does not sign the award. *See Kingston v. Kincaid*, 14 F.

Cas. 590, 592 (C.C.D. Pa. 1806) (No. 7,821) (Washington, J.) (finding award by two arbitrators

proper where third arbitrator refused to sign); *Maynard v. Frederick*, 61 Mass. (7 Cush.) 247,

251 (1851) (finding refusal of one arbitrator to assent to or sign the award "does not vitiate it, if a

majority had [the] power to act"); *Am. Eagle Fire Ins. Co. v. N.J. Ins. Co.*, 148 N.E. 562, 565

(N.Y. 1925) ("All [the arbitrators] should meet and hear the proofs, but the report of two is valid,

unless the third has been excluded from participation in their deliberations without fault on his

part."); *Kunckle v. Kunckle*, 1 U.S. 364, 364 (C.C.P. Pa. 1788) (finding no misbehavior by two

referees who signed award where third referee did not sign).

  Athena also argues that the award should be invalidated because Mr. Timban allegedly

"abandon[ed] his participation in the Arbitration" or "defected" from the panel, but Athena has

no evidence to support those claims. Athena's Mem. at 4, 24, 30. It is undisputed that Mr.

Timban attended all nine days of the hearings and heard all of the evidence. He stayed in the

room with the other arbitrators following closing arguments. Athena admittedly has no

"explanation or information" as to why Mr. Timban did not sign the award. Athena's Mem. at 4.

And it has no basis for its assertion that Mr. Timban withdrew or "defected" before participating

in the panel's deliberations. Indeed, FINRA has now stated publicly that Mr. Timban *did*

participate in the panel deliberations, and that he agreed with the other two arbitrators. *See* Ex.

25 to Deal Decl., P. Diamond, "FINRA to Conduct Arbitrator Background Checks," 45

Securities Reg. and Law Rep. 1213 (July 1, 2013) (quoting FINRA spokesperson as stating: "We

understand that Timban participated in the panel deliberations and agreed with the majority

decision."). Athena has not established that Mr. Timban resigned or withdrew before hearing all

of the evidence and participating in deliberations, and thus *Szuts v. Dean Witter Reynolds, Inc.* is distinguishable.  *See* 931 F.2d 830, 831 (11th Cir. 1991).

Because there is no evidence that Mr. Timban "defected" or "abandon[ed] his participation in the arbitration," Athena has not shown that an arbitrator's "misbehavior" violated Athena's rights.[4]  *See* 9 U.S.C. § 10(a)(3).  Moreover, the panel did not exceed its authority by issuing an award that was not signed by Mr. Timban.  *See* 9 U.S.C. § 10(a)(4).  Athena got exactly what it agreed to:  arbitration before a panel of three arbitrators and a decision signed by a majority of the arbitrators.

### B.    There Was No Basis for Removing Mr. Timban from the Panel.

In arguing that Mr. Timban should have been removed from the panel for non-disclosures, Athena relies on the wrong criteria.  The disqualification criteria cited by Athena are used to determine whether an arbitrator's name should be removed from the roster of arbitrators available for new appointments.  *See* Athena's Mem. at 16-18.  Those criteria are not applicable here because all of the allegedly disqualifying non-disclosures occurred after Mr. Timban was appointed to the panel for this case.  Once a panel of arbitrators has been appointed for a particular case, FINRA Code Rule 12407 governs removal of an arbitrator from that panel.  That rule provides:

> (a) Before First Hearing Session Begins
>
> Before the first hearing session begins, the Director may remove an arbitrator **for conflict of interest or bias**, either upon request of a party or on the Director's own initiative.
>
> (1) The Director will grant a party's request to remove an arbitrator if it is reasonable to infer, based on information known at the time of the request, that the arbitrator is **biased, lacks impartiality, or has a direct or indirect interest in**

---

[4] There are references in the Affidavit of David Moffitt to Mr. Timban's "defection" from the arbitration, but they are speculative and rhetorical, and not based on personal knowledge of the panel's deliberations.

***the outcome of the arbitration.***  The interest or bias must be definite and capable of reasonable demonstration, rather than remote or speculative.  Close questions regarding challenges to an arbitrator by a customer under this rule will be resolved in favor of the customer.

. . . .

(b) After First Hearing Session Begins

After the first hearing session begins, the Director may remove an arbitrator based ***only on information required to be disclosed under Rule 12405 that was not previously known by the parties.***  The Director may exercise this authority upon request of a party or on the Director's own initiative.  Only the Director or the President of FINRA Dispute Resolution may exercise the Director's authority under this paragraph (b).

*See* Ex. 21 to Deal Decl., FINRA Code Rule 12407 (emphasis added).  As set forth below, there was no basis to remove Mr. Timban under these relevant criteria and, thus, the panel did not exceed its authority by continuing with Mr. Timban in this case.

### 1.      Events Before the First Hearing Session

The only event that arguably occurred prior to the first hearing session was the filing of the New Jersey complaint against Mr. Timban for unauthorized practice of law – a complaint that was ultimately dismissed.[5]  Even if Mr. Timban had failed to disclose that complaint, that failure would not support his removal from the panel because it did not suggest that Mr. Timban was "biased, lack[ed] impartiality, or ha[d] a direct or indirect interest in the outcome of the arbitration."  *See* Ex. 21 to Deal Decl., FINRA Code Rule 12407(a)(1); *see also Remmey v. PaineWebber, Inc.*, 32 F.3d 143, 148 (4th Cir. 1994) (because losing party failed to show that undisclosed NASD discipline affected arbitrator's partiality, failure to disclose did not require vacatur of award).

---

[5] The unauthorized practice of law complaint, which was issued in September 2011, was filed before the first day of the arbitration hearing on November 2, 2011, but arguably, under FINRA rules, after the "first hearing session."  The parties had pre-hearing conferences on February 10, 2010 and December 14, 2010, and such pre-hearing conferences are considered "hearing session[s]" under the rules.  *See* Ex. 22 to Deal Decl., FINRA Code Rule 12100(n).

In any event, on March 22, 2012, Mr. Timban *did* disclose both the New Jersey complaint and the fact that he had informed the Michigan state bar about it.  FINRA promptly notified the parties.  *See* Ex. 24 to Deal Decl., Letter from FINRA enclosing e-mail from D. Timban, dated Mar. 22, 2012.  Athena did not conduct any further investigation at that time, and Athena did not seek Mr. Timban's removal.  Now, after the panel rejected its claims, Athena argues that Mr. Timban "concealed the seriousness of the State of New Jersey's charges against him," Athena's Mem. at 3, but Mr. Timban's disclosure was accurate.  Mr. Timban disclosed the specific charge against him and the docket number for his case.  *See* Ex. 24 to Deal Decl. ("In September of 2011, I was served with a complaint from the State of New Jersey, Case #11-10-01215-I charging me with the unauthorized practice of law.").  Further, Mr. Timban disclosed that he had notified the state bars of Michigan and New York of the New Jersey charge, thereby putting Athena on notice that Mr. Timban could face discipline in those states.  *Id.*

Athena thus has waived the argument that Mr. Timban should have been removed from the panel based on the charge of unauthorized practice of law and the subsequent discipline imposed by the Michigan bar.  Athena could have objected to Mr. Timban's continued service as an arbitrator when it learned of the criminal charge in the Spring of 2012.  If Athena wanted additional information it could have asked for it or conducted its own investigation.  Instead, Athena waited until it lost the arbitration before objecting to Mr. Timban's participation on the panel.  By the time Athena raised any objection, it was just "a sore loser improperly seeking a second bite at the apple."  *See Stone v. Bear, Stearns & Co.*, 872 F. Supp. 2d 435, 439 (E.D. Pa. 2012) (finding losing party waived argument regarding arbitrator's failure to disclose where "he failed to investigate the arbitrators as diligently *before* the arbitration as he did *after* he lost").  Such delayed challenges to an arbitrator are not permissible.  *See, e.g.*, *Remmey*, 32 F.3d at 148

("By raising this claim only after obtaining an adverse decision, Remmey's actions appear to constitute the ultimate attempt at a second bite.  If this challenge were sustained, nothing would stop future parties to arbitration from obtaining allegedly disqualifying information, going through with the proceedings, and then coming forward with the information only if disappointed by the decision."); *Merit Ins. Co. v. Leatherby Ins. Co*., 714 F.2d 673, 683 (7th Cir. 1983) ("We do not want to encourage the losing party to every arbitration to conduct a background investigation of each of the arbitrators in an effort to uncover evidence of a former relationship with the adversary. This would only increase the cost and undermine the finality of arbitration, contrary to the purpose of the United States Arbitration Act of making arbitration a swift, inexpensive, and effective substitute for judicial dispute resolution.").

### 2.     Events After the First Hearing Session

All of the other alleged non-disclosures involved events that occurred after the first day of the arbitration hearing on November 2, 2011.  Those events include the Michigan disciplinary charges and eventual suspension for writing checks on insufficient funds and for the unauthorized practice of law.  The Michigan unauthorized practice of law disciplinary complaint was based on the same unauthorized practice that led to the New Jersey complaint.  As noted above, Mr. Timban had disclosed the New Jersey complaint, and had disclosed that he had reported the complaint to the Michigan bar authorities.  Athena made no objection at the time, thereby waiving any argument for vacatur based on the non-disclosure of the disciplinary action regarding that unauthorized practice.

After the first hearing session began, FINRA could remove Mr. Timban "based **only** on information required to be disclosed under Rule 12405 that was not previously known by the parties."  Ex. 21 to Deal Decl., FINRA Code Rule 12407(b) (emphasis added).  Rule 12405 requires disclosure of:

16

> [A]ny circumstances which might preclude the arbitrator from rendering an
> ***objective and impartial determination in the proceeding***, including:
>
> > (1) Any direct or indirect financial or personal interest in the outcome of
> > the arbitration;
>
> > (2) Any existing or past financial, business, professional, family, social, or
> > other relationships or circumstances with any party, any party's representative, or
> > anyone who the arbitrator is told may be a witness in the proceeding, that are
> > likely to affect impartiality or might reasonably create an appearance of partiality
> > or bias;
>
> > (3) Any such relationship or circumstances involving members of the
> > arbitrator's family or the arbitrator's current employers, partners, or business
> > associates; and
>
> > (4) Any existing or past service as a mediator for any of the parties in the
> > case for which the arbitrator has been selected.

*See* Ex. 23 to Deal Decl., FINRA Code Rule 12405(a) (emphasis added).

None of Mr. Timban's legal troubles precluded him "from rendering an objective and impartial determination in the proceeding," and Athena does not even attempt to argue that they did. Specifically, an instance of writing bad checks in a completely unrelated matter does not demonstrate Mr. Timban's partiality or bias against Athena in this dispute. Similarly, putting aside the issue of waiver, the actions taken against Mr. Timban in Michigan relating to the unauthorized practice of law do not demonstrate partiality, bias, or conflicts of interest. Accordingly, the governing FINRA rules – the rules that Athena consented to in the underlying arbitration – did not permit removal of Mr. Timban from the arbitration panel based on any of the events that occurred after the arbitration hearing began.

### 3.    Mr. Timban's Conduct Is Not Cause for Vacatur Under § 10(a)(3).

Because arbitrator nondisclosures are significant only when they indicate bias or partiality, most courts have addressed claims of nondisclosure under the "evident partiality" provisions of Section 10(a)(2) of the FAA and not under the "other misbehavior" prong of

Section 10(a)(3).  *See STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68,

74 (2d Cir. 2011) (stating that the court was unaware of any cases "that have addressed claims of

insufficient [arbitrator] disclosure under the 'other misbehavior' prong"); *Stone*, 872 F. Supp. 2d

at 449 (recognizing the dearth of cases addressing non-disclosure claims under the misbehavior

prong of Section 10(a)(3) of the FAA because failures-to-disclose that would constitute

misbehavior would also likely reflect "evident partiality").  Here, Athena has no claim that Mr.

Timban was biased, lacked impartiality, or had conflicts of interests.

Even if the challenged "nondisclosures" or the underlying conduct could constitute

"misbehavior," Athena still would have to show prejudice in order to obtain vacatur, which it has

failed to do.  *See* 9 U.S.C. § 10(a)(3) (referring to "misbehavior by which the rights of any party

have been prejudiced").  It is Athena's burden to demonstrate "actual prejudice." *United House*

*of Prayer for All People of the Church on the Rock of the Apostolic Faith v. L.M.A. Int'l, Ltd.*,

107 F. Supp. 2d 227, 232 (S.D.N.Y. 2000).  To meet that burden, Athena must show

"misconduct so severe that it denies the aggrieved party a fundamentally fair hearing."  *Stone*,

872 F. Supp. 2d at 450 (citing *Apex Fountain Sales, Inc. v. Kleinfeld*, 818 F.2d 1089, 1094-95

(3d Cir. 1987); *Teamsters Local 312 v. Matlack, Inc.*, 118 F.3d 985, 995 (3d Cir. 1997); *Sherrock*

*Bros., Inc. v. DaimlerChrysler Motors Co.*, 260 F. App'x 497, 501 (3d Cir. 2008)).  Moreover,

"to establish prejudice, there must be a causal connection between the Arbitrator's conduct and

the award adverse to the [complaining party's] interest."  *N.Y. Newspaper Printing Pressman's*

*Union No. 2 v. N.Y. Times Co.*, No. 91 CIV. 4677, 1992 WL 122788, at *6 (S.D.N.Y. May 22,

1992).  There is no claim here that the arbitration was fundamentally unfair, and no evidence that

the outcome of the arbitration was affected by Mr. Timban's alleged misconduct – no evidence

of a causal connection between his challenged behavior and the award against Athena.  There

certainly is no plausible claim that Mr. Timban's actions had any impact whatsoever on the other two arbitrators, who found in favor of Goldman, Mr. Sheffer, and Mr. Gettleman, and whose votes were all that was needed.

In the absence of prejudicial misbehavior covered by the FAA, Athena cannot vacate the award, even if Mr. Timban violated a FINRA rule or his FINRA Oath of Arbitrator.  *See Leatherby*, 714 F.2d at 680 ("[E]ven if the failure to disclose was a material violation of the ethical standards applicable to arbitration proceedings, it does not follow that the arbitration award may be nullified judicially."); *Stone*, 872 F. Supp. 2d at 448 ("FAA permits vacatur only in narrow circumstances such as 'evident partiality,' not for mere 'failure to disclose' or 'FINRA rule infractions.'") (citations omitted).  "The arbitration rules and code do not have the force of law."  *Leatherby*, 714 F.2d at 680.  When vacatur is at issue, it is the FAA, and not the arbitral rules, to which a court must look.  *See id.* at 680-81.  Accordingly, because Athena has not established actual prejudice from arbitrator misbehavior, such conduct cannot justify vacatur under 9 U.S.C. § 10(a)(3).[6]

> **C.     The Panel Did Not Exclude Athena's Evidence and That Evidence Was Not Uncontroverted.**
>
> **1.     The Panel Did Not Exclude Athena's Evidence.**

Athena argues that the arbitrators "engaged in misconduct by *effectively* refusing to hear and consider evidence that was pertinent and material to Athena's claims in the Arbitration."

---

[6] Even if the Court were to find that Mr. Timban did not participate sufficiently in the arbitration, should have been disqualified, or that he "misbehaved," the proper remedy would not be to re-try the entire case to three new arbitrators.  Rather, FINRA should appoint a replacement arbitrator to review the record, including the transcripts of the testimony, and then to deliberate with Mr. Borer and Ms. Murphy.  This remedy is consistent with the FINRA Code.  *See* Ex. 20 to Deal Decl., FINRA Code Rule 12403(c)(6)(A) ("If an arbitrator is removed, or becomes otherwise unable or unwilling to serve, the Director will appoint a replacement arbitrator in accordance with this rule, unless the parties agree in writing to proceed with only the remaining arbitrators.").

Athena's Mem. at 31 (emphasis added).  Not only is that not the legal standard for vacating an arbitration award, but also it is factually untrue.

Under 9 U.S.C. § 10(a)(3), vacatur is possible "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced . . . ."  "In order to vacate an arbitration award on the ground of arbitrator misconduct . . . '[t]he misconduct must amount to a denial of fundamental fairness of the arbitration proceeding . . . .'"  *Roche v. Local 32B-32J Serv. Emps. Int'l Union*, 755 F. Supp. 622, 624 (S.D.N.Y. 1991) (citations omitted); *Stone*, 872 F. Supp. 2d at 449-50.

Section 10(a)(3) of the FAA addresses the actual refusal to hear pertinent and material evidence, not the "effective" exclusion of evidence, whatever that means.  Athena cannot point to one piece of material evidence that was excluded from the hearing.  In fact, the panel admitted all of the documents on which Athena now relies, heard all of the testimony to which Athena now refers, and heard all of Athena's arguments, orally and in writing, at length.  Therefore, there are no grounds for vacatur under Section 10(a)(3) based on a refusal to hear evidence.

At best, Athena's argument is a thinly-veiled attempt to re-litigate the case before this Court, which it is not permitted to do.  *See Mut. Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co. Ltd.*, 868 F.2d 52, 56 (3d Cir. 1989) ("It is not this Court's role, however, to sit as the panel did and reexamine the evidence under the guise of determining whether the arbitrators exceeded their powers." (citation omitted)); *Rivera v. Thomas*, 316 F. Supp. 2d 256, 260 (D. Md. 2004) (rejecting plaintiff's argument that arbitrator disregarded evidence, which was based only on plaintiff's dissatisfaction with the arbitration result); *Fine v. Bear, Stearns &*

*Co.*, 765 F. Supp. 824, 829 (S.D.N.Y. 1991) ("In sum, petitioners' claim that the hearing was

unfair amounts to no more than a disagreement with the arbitrators['] rulings on the weight and

relevancy of evidence.  However, it is well-settled that 'the arbitrator is the judge of the

admissibility and relevancy of evidence submitted in an arbitration proceeding.'" (citation

omitted)); *Cobec Brazilian Trading & Warehousing Corp. of the U.S. v. Isbrandtsen*, 524 F.

Supp. 7, 10 (S.D.N.Y. 1980) (rejecting argument that arbitrators "neglectful[ly] disregard[ed]"

evidence because both parties "had the opportunity to present evidence and arguments"

regarding the relevant issue, and concluding that petitioner's "right to be heard was [not] grossly

and totally blocked").

### 2.    The Evidence Was Not Uncontroverted.

Athena further argues that the panel ignored its "uncontroverted" evidence, *see* Athena's

Mem. at 31, but Athena's evidence was far from "uncontroverted."  As the panel recognized, the

evidence from Goldman, Mr. Sheffer, and Mr. Gettleman established that Athena received a

PPM for the Fund prior to investing and further that Goldman and its representatives made full

and accurate disclosures about the nature of the Fund and the risks associated with an investment

in it.  Ex. 1 to Deal Decl., Award ¶ 4.  The panel's conclusions were based, in part, on

assessments of credibility.  "The Panel found the testimony of each of the individual

Respondents [Mr. Sheffer and Mr. Gettleman] to be credible."  *Id.*  But "[t]he testimony given by

principals of the Claimant [Dr. Caruso and Mr. DiLella] supporting the allegation [that the PPM

was not given to Athena] was not convincing."  *Id.*

### a.    Athena's Receipt of the PPM

Athena's statement that it "established beyond peradventure that Goldman failed to send

the PPM to Athena before Athena made its investment decision," Athena's Mem. at 33, is simply

untrue.  Although Athena points out that Mr. DiLella did not acknowledge receipt of the PPM in

21

one particular email, Athena's Mem. at 32, Athena ignores the fact that Mr. DiLella *did* acknowledge receipt of the PPM, in writing, in Athena's Subscription Agreement.  Specifically, Mr. DiLella represented that Athena had received the PPM for Liquidity Partners and that he and/or his colleagues had "read and fully understand the [Private Placement] Memorandum" and that Athena was relying "solely upon the Memorandum."  Ex. 7 to Deal Decl., R-12 at 14, ¶ 5a; Tr. at 247, 251.  Mr. DiLella testified that he knew this provision was in the Subscription Agreement when he signed it, Tr. at 251, and that he understood that Goldman could and would rely on his representation that he had received and read the PPM, Tr. at 304.

The Subscription Agreement alone proved that Athena received the PPM before making its investment decision, but there was also additional evidence.  For example, Angela Shermer, a client analyst who worked with Mr. Sheffer at Goldman, testified that she sent Athena a PPM on August 13, 2007, in accordance with the same routine practice she used for eight years.  She explained how she electronically generated a PPM for Athena using the computerized PPM Generator.  Tr. at 491-92.  She testified that the PPM Generator kept a record of each personalized PPM, and she explained that the August 13, 2007 date on Athena's PPM for the Fund was generated automatically by the PPM Generator and could not be changed.  Tr. at 482-83; Ex. 6 to Deal Decl., R-7.  She demonstrated how she placed the double-sided PPM, a single-sided subscription agreement, and a return envelope into a Federal Express envelope addressed to Mr. DiLella on August 13, 2007.  Tr. at 485, 493-94, 503-05.  And she described how she then presented the unsealed Federal Express envelope for review by a compliance officer.  Tr. at 486-87.

Both Ms. Shermer and Mr. Sheffer testified that the compliance department would not have allowed the subscription agreement to be sent to Athena without a PPM having been sent.

22

Tr. at 1163-64, 1190-91.  The Federal Express package to Mr. DiLella was approved by

compliance and shipped overnight to Athena on August 13, 2007.  Exs. 3 & 4 to Deal Decl., R-

2A & R-2B.  Without weighing the package, Federal Express delivered the package to Athena's

office on August 14, 2007, where it was signed for by Athena's receptionist.  Exs. 3 & 4 to Deal

Decl., R-2A & R-2B; Tr. at 578, 582-83.  Mr. DiLella, that very day, signed and returned the

Subscription Agreement, acknowledging receipt of the PPM.  *See* Ex. 7 to Deal Decl., R-12.

On August 28, 2007, before the Fund closed, Ms. Shermer also sent Mr. DiLella an email

directing him specifically to the offering document for details on the Fund's term, noting that

there was a discrepancy between the term of the Fund as stated in the Bluebook versus the PPM

and clarifying the "term" provision.  *See* Ex. 10 to Deal Decl., R-77B.  Instead of responding that

Athena did not receive a PPM, Mr. DiLella simply responded "Thanks for the clarification

Angela." Ex. 11 to Deal Decl. R-78.  Athena never once stated that it had not received a PPM

until *after* the Fund suffered losses in late 2008.

The overwhelming evidence – including Athena's own written acknowledgement of

receipt and reliance upon the PPM – demonstrates that the PPM was sent to Athena prior to its

investment in the Fund.  Athena's contention that the PPM was not delivered was not credible;

the testimony of its principals on that point was "not convincing," to say the least.  Delivery of

the PPM to Athena, without more, defeated its nondisclosure claims, because the PPM made all

the risk disclosures at issue in the arbitration.  Ex. 1 to Deal Decl., Award ¶ 4.

### b.      The August 6, 2007 Email and the Bluebook

Athena has no basis for its assertion that the panel "totally disregarded Goldman's

misrepresentations and material non-disclosures in Mr. Sheffer's August 6, 2007 e-mail

attaching the Bluebook . . . ." Athena's Mem. at 33.  In fact, the evidence showed that Mr.

Sheffer did not make any misrepresentations or fail to disclose material information in his

August 6, 2007 communication to Mr. DiLella, which included the e-mail and the Bluebook for Liquidity Partners.[7]

    ***First***, the evidence showed that Mr. Sheffer's statement that Liquidity Partners was "not a hedge fund" was accurate.  *Cf.* Athena's Mem. at 8.  The Fund did invest in some of the same kinds of securities as hedge funds and was, therefore, sometimes classified as a hedge fund for "trading and reporting" purposes in internal communications.  Tr. at 1373-76, 1715; Exs. 16, 17, 18 to Deal Decl., A-31, A-32, A-34.  However, Mr. Sheffer, Mr. Gettleman, and Jonathan Beinner, Chief Investment Officer of the Goldman Sachs Asset Management Fixed Income Department, all testified that structurally, the Fund was more like a private equity fund than a hedge fund.  Tr. at 1374-77 (Gettleman); Tr. at 1708-13 (Beinner); Tr. at 1113-14 (Sheffer).  It took long-only positions; it did not "hedge."  And it had capital calls and an extended lock up period.  Tr. at 1375-76.  For those reasons, the Fund was accurately described in other internal communications, *e.g.*, Ex. 15 to Deal Decl., A-27, and in Mr. Sheffer's August 6 email as "not a hedge fund."  More important, the label "hedge fund" does not say anything about a fund's risk profile.  Tr. at 1116-21.  Some hedge funds are quite risky, but others are not.

    ***Second***, Mr. Sheffer did not mislead Athena by describing Liquidity Partners as an "opportunistic, high quality fixed income portfolio."  *Cf.* Athena's Mem. at 8.  Athena suggests that it did not know that the Fund would invest in high-yield corporate debt because such debt is not "high quality," but the Bluebook Mr. Sheffer sent with the e-mail clearly disclosed that the Fund would invest in assets that were below investment grade, including high-yield corporate debt, or junk bonds.  Ex. 5 to Deal Decl., R-5 at 6.

---

[7] The Award's brief explanation of the reasons for the panel's expungement directives included a reference to the August 6, 2007 e-mail; it is clear that the panel did not "disregard" the e-mail. Ex. 1 to Deal Decl., Award ¶ 4.

*Third*, the evidence showed that Mr. Sheffer's statement that Liquidity Partners was a "long-only buy and hold fixed income strategy" was not a misrepresentation. *Cf.* Athena's Mem. at 8. Unfortunately, the strategy did not play out as planned due to unforeseen and catastrophic market events in 2008 outside of Goldman's control. Tr. at 1761-66. In hindsight, the Fund's timing turned out to be poor. Tr. at 1471-72, 1761-66, 1788, 1923. But poor timing, a global financial crisis, and a failed strategy do not support a fraud claim.

*Fourth*, although Athena argues that the August 6, 2007 email did not explain that the fund would be "purchasing derivatives, futures, contracts, credit default swaps, and other highly volatile and inherently leveraged investment vehicles," Athena again ignores critical evidence. Athena's Mem. at 8, 9. The Bluebook attached to that email disclosed that the Fund would invest in derivatives and indexes, including the ABX. Ex. 5 to Deal Decl., R-5 at 10.

*Fifth*, there was no credible evidence that when Mr. Sheffer stated that there were "definitely areas of the debt markets we will be avoiding," he was representing that the Fund would never invest in subprime mortgages. *Cf.* Athena's Mem. at 8. In making such a claim, Athena relies on notes made by a summer intern during an internal Goldman call that Athena was not on. *See* Ex. 14 to Deal Decl., A-21; Tr. at 1076, 1413. This intern's understanding of an internal call does not clarify what Athena was told about the Fund's investment in subprime mortgages. Mr. Sheffer and Mr. Gettleman both testified that on the August 13, 2007 call with Dr. Caruso and Mr. DiLella, Mr. Gettleman explained that the Fund would invest in subprime mortgages. Tr. at 998, 1418.

*Finally*, contrary to Athena's claims, Athena's Mem. at 8-9, the disclosures regarding leverage were clear and accurate. The Bluebook disclosed that the Fund "engages in leverage" and that such leverage "may increase the volatility in the fund" and pose a "risk of investment

loss," including a risk of losing "the entire amount that is invested." Ex. 5 to Deal Decl., R-5 at 17, 18. Both Dr. Caruso and Mr. DiLella testified that they read these disclosures prior to Athena's investment in the Fund. Tr. at 72, 74, 174, 196, 417-18, 421, 443, 465, 634-35. They also both testified that they understood the risks associated with leverage. Tr. at 155, 409. Mr. Gettleman also testified that on the August 13, 2007 telephone call, he informed Dr. Caruso and Mr. DiLella that, although there was no limit on the amount of leverage the Fund could use, the target leverage range was 4-8x. Tr. at 1239, 1339-40. Mr. Gettleman provided the target leverage range on every one of the hundreds of calls he had about this Fund, because leverage was how the Fund hoped to achieve the targeted annualized returns of 15-20% net to investors. Tr. at 1330, 1340, 1411, 1488-89, 1493-94.

In sum, Athena's misrepresentation and non-disclosure claims relating to Mr. Sheffer's August 6 email, the Bluebook, and other alleged communications were simply disproven by the contrary record evidence. *See* Ex. 1 to Deal Decl, Award ¶ 5.

> **D. An Award Cannot Be Vacated for Manifest Disregard of the Law, And Even If It Could Be, The Panel Did Not Manifestly Disregard the Law.**
>
> > **1. The FAA Provides the Exclusive Grounds for Vacating An Arbitration Award.**

At one point, the Court of Appeals for the Third Circuit considered "manifest disregard for the law" to be a basis for vacatur. *E.g.*, *Metromedia Energy, Inc. v. Enserch Energy Servs., Inc.*, 409 F.3d 574, 578 (3d Cir. 2005). But in *Hall Street*, the U.S. Supreme Court announced that Section 10 of the FAA sets forth the "exclusive grounds for expedited vacatur." *Hall St. Assocs.*, 552 U.S. at 584. The Third Circuit has not yet decided whether "manifest disregard for the law" remains a viable ground for vacating an arbitration award. *See Rite Aid N.J., Inc. v. United Food Commercial Workers Union, Local 1360*, 449 F. App'x 126, 129 (3d Cir. 2011)

(noting Third Circuit has not decided the issue).[8]  Other Circuit Courts of Appeals have

disagreed about the continued validity of "manifest disregard for the law."

     Courts that have found "manifest disregard of the law" is not a valid ground for vacatur

have relied on the "clearly and repeatedly stated holding" in *Hall Street* "that §§ 10 and 11

provide the exclusive bases for vacatur and modification of an arbitration award under the FAA."

*Citigroup Global Mkts., Inc. v. Bacon*, 562 F.3d 349, 353 (5th Cir. 2009); *see also Affymax, Inc.*

*v. Ortho-McNeil-Janssen Pharm., Inc.*, 660 F.3d 281, 284 (7th Cir. 2011) ("This list is exclusive;

neither judges nor contracting parties can expand it.  [*Hall St. Assocs.*, 552 U.S. at 584].

Disregard of the law is not on the statutory list."); *Med. Shoppe Int'l, Inc. v. Turner Invs., Inc.*,

614 F.3d 485, 489 (8th Cir. 2010) ("We have previously recognized the holding in *Hall Street*

and similarly hold now that an arbitral award may be vacated only for the reasons enumerated in

the FAA." (citation omitted)); *Frazier v. CitiFinancial Corp.*, LLC, 604 F.3d 1313, 1324 (11th

Cir. 2010) ("We hold that our judicially-created bases for vacatur are no longer valid in light of

*Hall Street*.  In so holding, we agree with the Fifth Circuit that the categorical language of *Hall*

*Street* compels such a conclusion."); *Grain v. Trinity Health, Mercy Health Servs. Inc.*, 551 F.3d

374, 380 (6th Cir. 2008) (dicta) ("Hall Street's reference to the 'exclusive' statutory grounds for

obtaining relief casts some doubt on the continuing vitality of [the manifest disregard] theory.");

*Ramos-Santiago v. UPS*, 524 F.3d 120, 124 n.3 (1st Cir. 2008) (dicta) ("We acknowledge the

Supreme Court's recent holding in *Hall Street Assocs., L.L.C. v. Mattel, Inc. . . .*  that manifest

disregard of the law is not a valid ground for vacating or modifying an arbitral award in cases

brought under the Federal Arbitration Act . . . .").  The reasoning of these courts is persuasive;

---

[8] Athena's suggestion to the contrary is misleading.  The only post-*Hall Street* Third Circuit case
Athena cites does not apply the manifest disregard standard.  *See Freeman v. Pittsburgh Glass*
*Works, LLC*, 709 F.3d 240, 256 (3d Cir. 2013) (losing party unsuccessfully argued that arbitrator
was evidently partial in violation of 9 U.S.C. § 10(a)(2)).

this Court should conclude, as they did, that "manifest disregard" may no longer serve as a ground for vacating an arbitration award.

> **2.      Even If Manifest Disregard Were a Basis for Vacating an Award, The Panel Here Did Not Manifestly Disregard the Law.**

As a preliminary matter, the panel's decision did not turn on the fact that Athena disclaimed reliance upon alleged oral misrepresentations in its Liquidity Partners Subscription Agreement.  The panel also found that such alleged oral misrepresentations were not proven, in the first place.  Ex. 1 to Deal Decl., Award ¶ 4 ("Claimant's allegations with respect to misrepresentations during presentations by, and conversations with, Respondents were not proven.").  The panel further found that, contrary to Athena's assertions, the Bluebook for the Fund was not misleading and did not contain the omissions that Athena alleged.  *Id.* ("[W]e find that the Bluebook does include disclosures with respect to these matters, and [was] not materially misleading.").  And the panel also made extensive findings about the suitability of Athena's investment in the Fund.  *Id.*  Accordingly, even without relying upon the disclaimers in the Subscription Agreement and the extensive disclosures in the PPM, the panel made sufficient findings – even in its abbreviated statement of reasons for ordering expungement – to support the award against Athena.

Furthermore, even if the manifest disregard standard applied, the arbitrators here did not manifestly disregard the law.  Athena argues that the arbitrators acted in manifest disregard of the law by failing to consider the case law Athena cited in its post-hearing brief regarding the effect of written, contractual disclaimers of reliance on prior oral statements.  Athena's Mem. at 34-35.  Athena has no factual basis, however, for its contention that the panel did not consider its arguments.  In fact, the record reflects that the panel carefully considered both parties' arguments

with respect to the effect of such disclaimers.  The panel, after considering both sides' legal arguments, disagreed with Athena.  This is not manifest disregard of the law.

To vacate an award for manifest disregard of the law, Athena must show that there was "absolutely no support at all in the record justifying the arbitrator[s'] determinations."  *See News Am. Publ'ns, Inc. Daily Racing Form Div. v. Newark Typographical Union, Local 103*, 918 F.2d 21, 24 (3d Cir. 1990).  A district court may not vacate an award for manifest disregard unless it finds "that the arbitrators were aware of the law, understood it correctly, found it applicable to the case before them, and yet chose to ignore it in propounding their decision."  *Remmey*, 32 F.3d at 149 (citation omitted); *see also O.R. Secs., Inc. v. Prof'l Planning Assocs., Inc.*, 857 F.2d 742, 747 (11th Cir. 1988) ("If a court is to vacate an arbitration award on the basis of a manifest disregard of the law, there must be some showing in the record, other than the result obtained, that the arbitrators knew the law and expressly disregarded it.").

Legal error is not sufficient grounds for vacatur of an arbitration award.  *See Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs*, 357 F.3d 272, 279 (3d Cir. 2004) ("Our role in reviewing the outcome of the arbitration proceedings is not to correct factual or legal errors made by an arbitrator."); *Fluke v. CashCall, Inc.*, 792 F. Supp. 2d 782, 786 (E.D. Pa. 2011) ("An arbitrator's manifest disregard for the law is distinct from a merely erroneous application of the law.  Even an arbitrator's incorrect legal conclusion is entitled to deference." (citations omitted)).  Even "gross error" is not sufficient to vacate an arbitration award.  *Black Box Corp. v. Markham*, 127 F. App'x 22, 26 (3d Cir. 2005) ("[A] reviewing court does not look to see if an arbitrator has misinterpreted or misapplied the law.").

Athena's contention that the panel did not analyze the effectiveness of the non-reliance clause, *see* Athena's Mem. at 37, has no support in the record of the arbitration proceeding.  The

arbitrators did not "skip[] that step," as Athena alleges.  In fact, the panel explicitly requested

that the parties address the issue in their closing arguments and post-trial briefs.  *See* Tr. at 2037-

38.  Both parties did address the issue in their closing arguments, *see* Tr. at 2201-02, 2261-62,

and in their post-hearing briefs, *see* Ex. 26 to Deal Decl., Respondents' Post-Hearing Br. at 8-11;

Ex. 27 to Deal Decl., Athena's post-hearing Br. at 17-20.  All of the available information

suggests that the panelists carefully considered the parties' positions.

Athena also misrepresents that the law on non-reliance clauses is clearly in its favor.  As

Goldman, Mr. Sheffer, and Mr. Gettleman explained to the panel in their post-hearing brief, the

law honors the type of non-reliance clause at issue in this case.  When a sophisticated investor

such as Athena signs a subscription agreement stating that the investor received, read, and relied

on a private placement memorandum and not on oral statements, that non-reliance agreement

will be enforced.

> Securities law does not permit a party . . . to say, in effect, "I lied when I told you
> I wasn't relying on your prior statements," and then to seek damages for their
> contents . . . .  [A] written anti-reliance clause precludes any claim of deceit by
> prior representations. . . .  A non-reliance clause . . . ensures that both the
> transaction and any subsequent litigation proceed on the basis of the parties'
> writings, which are less subject to the vagaries of memory and the risks of
> fabrication.

*Rissman v. Rissman*, 213 F.3d 381, 383-84 (7th Cir. 2000); *see Yocca v. Pittsburgh Steelers*

*Sports, Inc.*, 854 A.2d 425, 439 (Pa. 2004) ("Appellees simply cannot be said to have justifiably

relied on any representations made . . . before the parties entered into the SBL Agreement. . . .

Appellees explicitly disclaimed reliance on any such representations.");[9] *Blumenstock v. Gibson*,

---

[9] Pennsylvania law applies to Athena's common law fraud claim because Pennsylvania is where
the alleged misrepresentations were made and the alleged reliance occurred.  *See* Tr. at 2035;
*Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.,* 94 F. Supp. 2d 589, 594 (E.D. Pa. 1999)
(quoting Restatement (Second) of Conflict of Laws § 148(1)).

811 A.2d 1029, 1036 (Pa. Super. Ct. 2002) ("[A] party cannot justifiably rely upon prior oral representations yet sign a contract denying the existence of those representations.").

Contrary to Athena's assertions, *see* Athena's Mem. at 35-36, federal courts in New York do not hesitate to enforce non-reliance agreements between sophisticated parties that specifically refer to the representations made in an offering memorandum and disclaim reliance on any other representations. *See Frati v. Saltzstein*, No. 10 Civ. 3255, 2011 WL 1002417, at *1-2, *4 (S.D.N.Y. Mar. 14, 2011) (finding reliance unreasonable where investors represented that they were sophisticated, had "carefully read, underst[ood], and agree[d] to abide by the terms set forth in the Memorandum," and "relied solely upon the information in the Memorandum and ha[d] not relied on oral representations or warranties"); *San Diego Cnty. Emps. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 121 (S.D.N.Y. 2010) (dismissing federal securities and common law fraud claims, finding reliance unreasonable in light of "the sophistication of [plaintiff] and its investment advisor, and the clear, unambiguous language of the non-reliance provisions" in the subscription agreement and the PPM); *Spain v. Deutsche Bank*, No. 08 Civ. 10809, 2009 WL 3073349, at *1, *3 (S.D.N.Y. Sept. 18, 2009) (dismissing federal securities and common law fraud claims where "[the] Subscription Agreement . . . acknowledged receipt of the Offering Materials, as well as represented that the signor relied solely on the Offering Materials in making his investment decision, had independently investigated their investments in the Fund, and were capable of bearing [a] complete loss of their investment"); *Dressner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 492 (S.D.N.Y. 2005) (recognizing that "in appropriate circumstances, sophisticated parties may waive rights to rely on statements made outside an agreement, thereby precluding themselves from alleging fraud on the basis of those statements"). Athena's disclaimer of reliance was as specific, if not more specific, than the similar provisions found to

31

be enforceable in the foregoing cases.  Athena, a sophisticated party, represented that it "read and fully underst[ood] the [PPM]," "relied solely upon the [PPM] . . . in purchasing the Fund Interests," and was not "relying on [Goldman] . . . with respect to . . . economic considerations involved in this investment."  Ex. 7 to Deal Decl., R-12 at 14, ¶ 5a.

In sum, the panel was presented with two different views on application to this case of the law governing non-reliance provisions, and it found the arguments from Goldman, Mr. Sheffer, and Mr. Gettleman more convincing.  Athena's suggestion that the panel did not consider its arguments is contrary to all of the available information and based on nothing more than the fact that Athena lost.  Athena has not shown that there was "absolutely no support at all in the record justifying the arbitrator[s'] determinations." *See News Am. Publ'ns, Inc.*, 918 F.2d at 24.  Accordingly, Athena has not shown that the panel manifestly disregarded the law.

V.      **CONCLUSION**

For the foregoing reasons, Goldman, Mr. Sheffer, and Mr. Gettleman respectfully request that the Court deny Athena's Motion to Vacate and Remand Arbitration Award and grant their Application for Order Confirming An Arbitration Award Including Expungement Relief. *See* 9 U.S.C. § 9 (the Court "must" grant an order confirming an arbitration award unless it is vacated or modified, pursuant to FAA sections 10 or 11).

Respectfully submitted,

Dated: July 8, 2013.

/s/ Edward M. Posner
Edward M. Posner (I.D. No. 19363)
Kathryn E. Deal (I.D. No. 93891)
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA  19103-6996
(215) 988-2700
E-mail: Edward.Posner@dbr.com
E-mail: Kathryn.Deal@dbr.com

C. Evan Stewart
GOLDMAN, SACHS & CO.
200 West Street
New York, NY  10282
(212) 855-0753

*Attorneys for Respondents*

## <u>CERTIFICATE OF SERVICE</u>

I, Kathryn E. Deal, hereby certify that on July 8, 2013, I caused a true and correct copy of

the foregoing Memorandum of Law in Opposition to Motion to Vacate and Remand Arbitration

Award, and the Declaration of Kathryn E. Deal in support thereof, to be served by first class

mail, postage prepaid, upon the following:

> David R. Moffitt, Esquire
> Saul Ewing LLP
> 1200 Liberty Ridge, Suite 200
> Wayne, PA 197087-5569
>
> *Counsel for Athena Venture Partners, L.P.*

Dated:    July 8, 2013.                    /s/ Kathryn E. Deal
                                                    Kathryn E. Deal